Tennessee and others. Arguments not to exceed 15 minutes per side. Mr. Moore for the appellant. Good morning, Your Honors. May it please the Court, my name is Deshaun Moore, I represent the appellant, Mr. Joe Allen. We respect the request of three minutes to rebut. You may. You know, I trust that this Court has read our briefs and is familiar with the facts, so I'll just lead right into what we believe are the pertinent oral arguments for this particular matter. Number one, the lower court has erred in granting the motion for summary judgment. We contend that our response in the memorandums were sufficient to meet the requirements of Rule 56D. Number two, the lower court erred in ruling that there was no contractual relationship between the City of Jackson and the appellant. Although the City of Jackson's zero-tolerance, drug-free policy was signed by each and every employee, it created a contract between the City and the employees. And what was the consideration for that contract then? I'm sorry, Your Honor? What was your client's consideration for the contract? He was already an at-will employee, so in order to have an additional, you're saying that the zero-tolerance policy is a contract. Yes, Your Honor. What's the consideration? His consideration was he actually gave up a thing that he was entitled to, or a benefit that he was receiving. The benefit was the ability to take rehab if he were found to have consumed an illegal drug. Prior to, what we have to consider, Your Honor, is what the City's motivation was to institute this policy. Prior to the institution of this policy, there was an EAP program, an Employment Assistance Program, which included treatment for individuals who used illegal drugs. Was the existence of that program contractual? Again, your man was an at-will employee, so did he have a contractual interest in the existence of that policy? Did he have a contractual existence? No, Your Honor. He had a benefit as an employee. However, the way this policy was rolled out, each and every employee had to sign it. When I say each and every employee, it was volunteers, it was part-time employees, it was temporary employees. Everyone all of a sudden had to sign a document and say, well, I'm going to submit to a drug test to keep my job. That's what I have to do. And if I fail this drug test, then I will receive the opportunity to challenge this. Well, first, the drug test had a screening and then a confirmation test. So if an individual failed the screening and then the confirmation also showed a positive drug test, then that person was terminated. Then the person would have the opportunity to appeal in one of two ways, or twice, actually. Once at the City's expense and secondly at their own expense. Now, there's case law that says that in the state of Tennessee, in order for an employer to be bound by policy change, or an employer to change the status of an employee through a policy change, the employer has to be bound. What the employer did in this instance was bind itself to provide this drug testing. Prior to the zero tolerance policy, there was no requirement for any drug testing. If a person was believed to have used an illegal substance, they could have been terminated. At least an at-will employee could have been terminated without a drug test. So since the City wanted to save approximately $30,000 a year, it implemented this new policy. And it bound itself to the employees and the appellant. But then your man did test positive. You argue about the level, but there's nothing in the zero tolerance policy about level, right? It says positive, and your man had .16 and .18 on the two times. So why doesn't that fall directly within the policy? There's an ambiguity in the policy. It says on its face, zero tolerance policy, and then it speaks of a screening test. Now, commonly screening tests require that to show a positive test, the cutoff is 50 nanograms per milliliter. Well, that's what the company sort of says, but it's not in the policy. The policy says positive or negative. Well, the policy says if you fail a drug screening. It doesn't say positive or negative. Fail drug screening. A drug screening can be lowered or higher based on what the actual employer wants it to be. The title is zero tolerance. Yes, Your Honor. So what should this court do with that knowledge that your client had, that it was called zero? Well, the title is zero. True enough, Your Honor. If we were to have had discovery and inquire as to what was an actual level that the city was using, and if the city would have responded that we were actually at zero, then there would be no ambiguity there. Apparently, in the court where you found yourself, there was a local rule that required a response to a submission of material facts that you were to dispute. Yes, Your Honor. Apparently, you on behalf of your client did not dispute the material facts in a timely fashion in accordance with the local rule. We filed a declaration pursuant to Reliance Metal Works versus Guillermo Marco, which was the case that was decided in 2013. In that case, this court ruled that an affidavit under Rule 56D can be, a declaration can be given. The declaration can actually be the memorandum of law. What we provided was a response. The response clearly stated that there was no dispute. So, a response with an affidavit attached? Well, the affidavit, there was no affidavit, but there was a sworn statement. The Rule 11 of the Federal Rules Procedure and the local rules. A sworn statement. Some attested, so that was factual? I'm sorry, Your Honor. What was in that statement? What was in the statement was that? What did it offer to the court in a challenge to what the city had? Well, if I may, Your Honor. You may. The motion for summary judgment was filed before the scheduling order was ever entered. Our response was filed eight days after the scheduling order was entered. There was no record for us to rely upon, Your Honor. When this response was given, there had been no discovery done whatsoever. I absolutely appreciate that. So, what did you give in response to rebut the motion for summary judgment? We gave a declaration. And, okay, what was in that declaration? Was it sworn to? Yes, Your Honor. Okay, and what did it include that challenged what the city had put forth? That was, well. What was in the declaration, sir? The declaration or the reply and response stated that we had not proceeded with any discovery. We got that. Did you give anything from your client that said, I didn't take any drugs, and they're wrong, anything? No, Your Honor, we did not. You had argument. We had argument. But you're talking about a declaration. Was that yours? That was my declaration, Your Honor. And that said, I want discovery? Yes, Your Honor. Oh, okay, all right. But it wasn't a declaration of facts or affidavit of statement as opposed to argumentation. In other words, as Judge Cook said, I didn't take drugs or I aver on information and belief that the standard is above zero, anything of that sort? No, Your Honor. All right, anything else? Yes, Your Honor. And I think the court, again, erred with the issue of the contract. Without the contract, then basically what the city of Jackson is able to do is to arbitrarily give a drug test, not set the standards of what is passing and what is failing, issue a statement to the media and press, and disparage a person and end their careers, Your Honor. This is, in fact, a contract, Your Honors. The city of Jackson was bound to provide certain things to my client and to all the similarly situated individuals. Further, the contract created a situation where Mr. Allen had a property interest in his job. In a specific instance, if he failed a drug test, what he was required to receive was one drug test with a confirmation and two rights of appeal. Mr. Allen was fired as soon as the confirmation was given. It wasn't until a month later that he was able to receive the second drug test, and he never received the third drug test, Your Honors. He thought the third was supposed to be at his own instigation and cost. Did he do that or ask to do it? He asked to do it approximately five weeks after his termination, and that was never given to him. Subsequent to that, I was retained, and we attempted to get the urine sample to no avail. We requested it from the hospital, the co-defendant. Is there a time limit on that third test? My understanding is that the urine sample is good for about a year, and we'll well past that year. No, I just meant within the rule or the policy. There isn't, Your Honor. So he was not provided that opportunity, Your Honor. Can I reserve the rest of the time, ma'am? You may. Thank you. We have the remaining time for rebuttal. Mr. Condor? Good morning, Your Honors. May it please the Court, my name is Dale Condor. I'm here on behalf of the city of Jackson and its mayor, Jerry Gist. If I could, I would like to start with the issue about the Rule 56D declaration. There is no sworn statement, no affidavit, no declaration. I think we've figured that out. Okay, I'll go on then. And based on that, I think that it is clear that Judge Breen did not abuse his discretion in denying the simple request in the memorandum to take additional discovery in this matter, since it did not comply with the Rule 56D, nor is there a motion asking for discovery. And the Abercrombie v. Fitch case is cited by the appellant. But in Abercrombie, citing, I think it's a plot case, the Court goes on to say that if you don't comply with Rule 56D and you don't file a motion to compel discovery, then this Court is not going to look into whether the motion was filed, or whether there should have been additional discovery once the motion for summary judgment was filed. And the policy in this case, I believe Judge Cook mentioned that it says it's a zero-tolerance policy, and that's what it says. When you read the policy, what it prohibits in a nutshell is employees being under the influence of drugs, illegal drugs, in this case marijuana, while performing their duties for the city. It says under the influence is defined in the policy as levels sufficient to cause the laboratory to report a positive drug strain, that there is positive for the marijuana. And that's exactly what the city had in this case. This test was done initially, I believe, in April of 2012. There was a second test done in May of 2012, and both of those are in the record. And although the plaintiff argues that they're not authenticated, they are by Lynn Henning's affidavit that I think is in the record entry 9-3, where she says these are, in fact, the drug test results that the city received from the laboratory. Authentication simply being, as the Court well knows, that the thing is what we claim it to be, and Ms. Henning was qualified to say that, so it is, in fact, authenticated. The policy is not a contract. As Judge Breen said in his memorandum, it does not obligate the city to do anything. The city is not even obligated to do the second test. It said that if you're positive in the first test, there may be a second test. And this Court's language and this Court's opinions in looking at mandatory versus permissive language is quite clear, if we had will or shall, then there would have been an obligation on the city. That still would not have created a contract, but in any event, it said that there may be a second test. And the same thing about the third, that is it says a third test may be conducted on the same sample. You make the same argument with respect to that because your adversary says they asked for the third test and never got it. Correct, Your Honor, it may, and they did ask for the third test. I think they probably asked for it twice. There is a series of letters that Judge Breen in his order outlines because that's one of the things, if I could skip ahead just a second to the issue about the stigma plus theory, that he was denied a name-clearing hearing and he argues that it would have been pointless. The city had agreed in the fall of 2012 with Mr. Allen's counsel to have a name-clearing hearing January 31st, 2013. During this time, there was an exchange of letters. One of these letters, I believe it's, well, it's document 18-3. It's a September 25th letter saying that the second test was done in May and it provided copies of the two test samples and of the results of the samples. And then they talked about in document 9-6, it was a letter dated October 12th, that confirmed who the hearing officer would be and that if Mr. Allen needed any help getting records from the city, from the hospital or the testing lab, the city would help him out. The obligation was on Mr. Allen for that third test and what he did was send a letter to the city saying that he had talked to LabCorp about doing the test and they were agreeable and the city responded that LabCorp is a courier, not a testing laboratory. You pick the lab. We'll make sure it meets all the analytical criteria, whatever they have in the labs, and then we'll see to it that it goes there. Mr. Allen did nothing after that point and that was in the fall, at the latest, it was in the fall of 2012, Your Honor, so he had the opportunity to have that test done. He just never took it. Let me ask you one other thing. You said that the second test was itself also permissive, but at the top of, I guess, the last page, which seems to be the action item, it says confirmed positive test results of a current employee will result in immediate termination, whereas an applicant who initially tests positive won't be permitted, but this sounds like you needed, at least on its face, you needed to have a confirmed positive test, that is the two tests, in order to terminate someone. How do you read that language? Your Honor, I think that the way the policy says is if you're under the influence of the drugs and how it defines under the influence that you get a positive result, then the city will terminate you based on that result. And whether the second test, I think the second test was permissive, but regardless, it was done and it also confirmed what Mr. Allen was under the influence of the drugs. And the argument that because Mr. Allen and every other city employee signed this policy makes it a contract simply doesn't go anywhere because the employees also all signed the handbook and the signature page is at record entry nine, I think, for Mr. Allen, showing that he was an employee at will and there was nothing to change that. Judge Breen correctly found that Mr. Allen did not have a property interest in his job as a police officer with the city of Jackson. As the court well knows, Tennessee operates under the presumption of an at-will employment situation and for that to be changed, there has to be specific language that takes it out and says, we can only terminate this employee for cause and there's nothing in that policy that changes that. As far as the defamation and the stigma plus theory, I think those can be lumped together. First place, the city offered Mr. Allen a name-clearing hearing and five days before that, his attorney sent an email to the city's attorney who was handling that, telling him that Mr. Allen's gonna waive his hearing, we're gonna proceed with a lawsuit. So he waived his right to a name-clearing hearing and so there's not an issue there. As far as the defamation, as a public official, as a police officer, Mr. Allen was a public official. There's no showing of actual malice, that is that the statement was false or that Mayor Guest entertained serious doubts as to the truthfulness of the lab reports. So Judge Breen was correct in that and I've covered the issue about the contract. There simply was no contract between the city and Mr. Allen. He was and remained an at-will, and it was still within his probationary period, which is another strike against there being a property interest. We'd ask that the court affirm Judge Breen's order in this case. Thank you. Mr. Moore, you have three minutes for rebuttal. Thank you. Concerning the issue of the name-clearing hearing or the receiving hearing sample, again, our office attempted to get the hearing sample from Jackson Madison Hospital as late as November of 2012. What was responded, and that's not in the record, what was given back to us was that this person was not a patient with Jackson Madison. It's our position that the policy created something, created a contract, is what we argue, but it definitely created something. It created a procedure in which if a person fails a drug test, he's entitled to a process to clear his name. With respect to the test, your adversary at least says that they said, fine, you tell us the lab, if it's a good lab, we'll make sure it gets there. Is that accurate as to what happened? I don't think at the time. You said you were trying to get it from the hospital, but presumably they've got control over it and they don't want it to go to UPS, they want it to go to a lab. In the fall of 2012, there's a series of letters. The last letter was, as counsel stated, but in the fall, it wasn't that way. All the onus was on Mr. Allen to procure the urine sample, get a lab to do it, and it wasn't in compliance with how the policy was stated. The name-clearing hearing, again, and the reason why the name-clearing hearing didn't go forward was because the only way he could clear his name or not clear his name was to test the urine sample and see exactly what it was. My client has never admitted to smoking marijuana at any time. It's part of our argument, and why we sued the city of Jackson-Madison was because we believed that it was erroneously handled. However, we didn't. I take it you did not, you just said his position is that he never smoked marijuana, but that wasn't in what you call the declaration or the affidavit. No, it was not. I believe it was in the original complaint, though, Your Honor. All right, anything else? Nothing further, Your Honor. Okay, thank you, counsel. That case will be submitted, and the clerk may call the next case.